IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA, )
                          )
          Plaintiff,      )
                          )
vs.                       ) 3:13-CR-00276-B-7
                          )
SALVADOR MARTINEZ,        )
                          )
          Defendant.      )

SENTENCING HEARING
BEFORE THE HONORABLE JANE J. BOYLE
UNITED STATES DISTRICT JUDGE
10-08-2020

A P P E A R A N C E S
For the Government:

     UNITED STATES ATTORNEY'S OFFICE
     1100 Commerce Street - 3rd Floor
     Dallas, TX  75242
     214/659-8600
     BY:  GEORGE LEAL

For the Defendant:

     The Law Offices of Barbare & Associates
     8344 East RL Thornton Frwy - Suite 404
     Dallas, TX  75228
     214/324-4417
     BY:  ROBERT RAY SIMMONS

COURT REPORTER:   SHAWNIE ARCHULETA, TX CCR No. 7533
                  1100 Commerce Street
                  Dallas, Texas 75242

proceedings reported by mechanical stenography,
transcript produced by computer.

```
 1                    (In open court at 1:47 p.m.)
 2              THE COURT:  This is United States v.
 3      Salvador Martinez, 3:13-CR-276.
 4              Who is here for the government?
 5              MR. LEAL:  Good afternoon, Your Honor,
 6      George Leal for the United States.
 7              THE COURT:  Who is here for the defendant?
 8              MR. SIMMONS:  Robert Simmons for Salvador
 9      Martinez, Your Honor.
10              THE COURT:  Okay.  Please be seated for a
11      moment.
12              You need to stand up for just a minute,
13      Mr. Martinez, please.
14              THE DEFENDANT:  Yes, ma'am.
15              THE COURT:  I'm going to ask you a
16      question.  Before I do, I'm going to place you under
17      oath.  So raise your right hand as best you can.
18              (The Defendant was sworn.)
19              THE DEFENDANT:  Yes, ma'am.
20              THE COURT:  Okay.  Have you read
21      thoroughly through the presentence report, I mean
22      paragraph by paragraph, word by word with
23      Mr. Lehmann (sic) before today?
24              THE DEFENDANT:  Yes, ma'am.
25              THE COURT:  You understand what's in the
```

```
 1   PSR?

 2               THE DEFENDANT:  Yes, ma'am.

 3               THE COURT:  Any questions about it?

 4               THE DEFENDANT:  No, ma'am.

 5               THE COURT:  All right.  I have the

 6   Government's Response to the PSR, which is -- they

 7   accepted on Document 427.

 8               I have the objections to the PSR in

 9   Document 437.  It's pretty lengthy.

10               Have you been through this motion, these

11   objections, thoroughly and looked over them

12   thoroughly with your attorney?

13               THE DEFENDANT:  Yes, ma'am.

14               THE COURT:  Before today?

15               THE DEFENDANT:  Yes, ma'am.

16               THE COURT:  Any questions about them?

17               THE DEFENDANT:  No, ma'am.

18               THE COURT:  Okay.  I have an addendum to

19   the PSR, Document 442-1.

20               Have you read over that with Mister --

21   with him very carefully?

22               THE DEFENDANT:  Yes, ma'am.

23               THE COURT:  Okay.  Do you understand them?

24               THE DEFENDANT:  Yes, ma'am.

25               THE COURT:  Do you have any questions
```

1    about them?

2              THE DEFENDANT:  No, Your Honor.

3              THE COURT:  All right.  Okay.  Then I have

4    Order of Conviction -- I'm not sure why this is in

5    here -- but of Jorge Solis.  Have you seen this?

6    Okay.  I don't think it's part of the presentence

7    papers.

8              Then I have the second addendum, Document

9    760-1.

10             Have you read over that very carefully

11   with your attorney, Mr. Lehmann?

12             THE DEFENDANT:  Yes, ma'am.

13             THE COURT:  All right.  Do you have any

14   questions about it?

15             THE DEFENDANT:  No, Your Honor.

16             THE COURT:  Do you understand it?

17             THE DEFENDANT:  Yes, ma'am.

18             THE COURT:  Then I have your attorney's

19   Supplemental Objections to the Presentence

20   Investigation, and that's Document 766.

21             Have you read over that with him very

22   carefully?

23             THE DEFENDANT:  Yes, ma'am.

24             THE COURT:  All right.  And then next I

25   have a very lengthy document, Document 767.  It's

1    the Government's Response to the Defendant's

2    Objections to the Presentence Report.

3              Have you read that over very carefully --

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  -- very carefully with your

6    attorney?

7              THE DEFENDANT:  Yes, ma'am.

8              THE COURT:  Are you sure?

9              THE DEFENDANT:  Yes, ma'am.

10             THE COURT:  Do you understand it?

11             THE DEFENDANT:  Yes, Your Honor.

12             THE COURT:  All right.  The government's

13   downward departure -- which is 768, and it's a

14   pretty lengthy document -- have you had a chance to

15   read over the 5K, the Motion for Downward Departure

16   with your attorney?

17             THE DEFENDANT:  Yes, ma'am.

18             THE COURT:  Any questions about it?

19             THE DEFENDANT:  No, ma'am.

20             THE COURT:  Let's hear your objection.

21             You can be seated.

22             Mr. Lehmann, I would like you to stand.

23             MR. SIMMONS:  Your Honor, we're the second

24   attorney.  Mr. Lehmann was appointed on it prior to.

25             THE COURT:  I'm sorry.  I'm sorry.

1          You're who?

2          MR. SIMMONS:  I'm Robert Simmons.  I

3     wanted to make sure the record is clear.

4          THE COURT:  I'm very sorry I got your name

5     wrong.  I have it right up here.  My fault.  Go

6     ahead.

7          MR. SIMMONS:  So there was Mr. Lehmann

8     before who did the previous objections, and we did

9     the supplemental objections.

10          THE COURT:  I see.  So are you relying on

11     his objections or yours?

12          MR. SIMMONS:  Ours plus the supplement,

13     yes.

14          THE COURT:  Okay.  Okay.  Go ahead.

15          MR. SIMMONS:  The previous objections that

16     had been filed, the first one is dealing with the

17     quantity amounts of the drugs, which it doesn't

18     change the range of the -- and where the level

19     falls, although it may come into play in terms of

20     where you would like to sentence in that range in

21     the case, Your Honor, so it doesn't change the

22     actual level where he's being placed.

23          The second objection is --

24          THE COURT:  Let's go through that.  What

25     are you objecting to?

1          MR. SIMMONS:  The objection was they

2    attributed 453.6 grams of high purity

3    methamphetamine to Mr. Martinez.  And what

4    Mr. Lehmann was arguing is the second part of that

5    was by -- let's see.  Let me look at this real

6    quick.

7          The 283.5 grams that we had been dealing

8    with between Cisneros and Keester were these other

9    codefendants.  I'm not sure he had knowledge of that

10   or what he was even involved in.  There were no

11   facts to support the direct relationship or had

12   taken care of those drugs --

13          THE COURT:  Mr. Cisneros and who?

14          MR. SIMMONS:  A guy named Keester.

15          THE COURT:  Um-hum.

16          MR. SIMMONS:  And he was arguing about

17   taking out the 283.5 grams -- I guess the relevant

18   conduct -- that it wasn't reasonably foreseeable for

19   Martinez to know about this 283.5 grams of

20   methamphetamine between the codefendant, Cisneros,

21   and this individual named Keester, and that's what

22   the objection was.  But it doesn't change the actual

23   level where he's being placed.

24          THE COURT:  All right.  Mr. Leal.

25          MR. LEAL:  Judge, just in response, the

1    government did address that objection in its

2    response.  And certainly the case agent is here if

3    the Court would like to hear from him.

4             THE COURT:  Go ahead.

5             MR. LEAL:  Okay.  As far as the

6    government's opinion, Your Honor, the government

7    believes that it is appropriate to hold him

8    responsible for that 453.6 grams.

9             In the government's response to the

10   objections, the government included Government's

11   Exhibit Number 1, which is a transcript that falls

12   between the defendant and Tatuado, which happens to

13   be Mr. Cisneros, Your Honor.  And in that, they do

14   use coded language in there.  The initial call is

15   that Tatuado, Mr. Cisneros, tells the defendant,

16   "Hey, the guys called, and they said they needed

17   another one."

18            THE COURT:  Okay.  Mr. Leal, is this

19   dealing with the same drug transaction that he's

20   being held liable here for in the presentence

21   report?

22            MR. LEAL:  Yes, Your Honor.

23            THE COURT:  Okay.  Okay.

24            MR. LEAL:  Which my understanding is it's

25   the defendant's objection to paragraph 16.

1          THE COURT:  Sixteen, all right.

2          MR. LEAL:  And in that, it should be noted

3    that case agents determined in this particular case

4    that "a whole one" referred to a pound, usually

5    refers to kilogram, but whatever the investigating

6    agent determined in this particular case, it

7    referred to a pound in his opinion.  So that's what

8    we've gone off of.

9          Subsequently, the conversation talks about

10   and demonstrates how they're working together.

11         Cisneros tells the defendant, "Hold them

12   off until Monday.  Tomorrow night we will pull it

13   out and give it to them Monday morning."

14         THE COURT:  Okay.  You've given me enough.

15   I think I'm going to overrule the objection.

16         So his objection is that Cisneros and

17   Keester were doing things that this guy didn't know

18   about.  You say he knew about it, because you've got

19   a transcript of them talking about it.

20         MR. LEAL:  Well, they've got a transcript

21   of them working out together, Mr. Cisneros and Saul,

22   and I believe it's reasonably foreseeable that he

23   would know that the methamphetamine is being

24   distributed to other people.

25         THE COURT:  All right.  I'm going to

1    overrule the objection.  And you have a very, very

2    good response.  It's very thorough, and I think I'm

3    going to rely on that.

4              Is there anything else that you have?

5              MR. LEAL:  No, Your Honor.  There are some

6    other objections.

7              THE COURT:  Oh, no, we're going to go to

8    the next objection.

9              MR. LEAL:  Yes, Your Honor.

10             THE COURT:  Overrule the objection.

11             Objection to paragraph 20.

12             MR. SIMMONS:  Yeah, this is dealing with

13   the second objection that Mr. Lehmann had filed,

14   which was a mitigating role.

15             And what Lehmann had kind of laid out is

16   whether it's a four or two.  It doesn't look like he

17   made an argument for a four-level or two-level or

18   three-level, he just wanted it to apply, is what it

19   looks like to me, Your Honor.

20             And he lays out on page 5 of the

21   objection, the actual overt acts of Mr. Cisneros and

22   him overseeing Martinez as basically an errand boy.

23             You have Cisneros instructing Martinez to

24   lease the garage.  And then you have him directing

25   Martinez to pick up some methamphetamine, that was

11

1   back in May of 2013; and then instructing
2   Mr. Martinez how to package and deliver the
3   methamphetamine; and July 12th, picking up some; in
4   August, picking up a package and then taking care of
5   it at the garage in August.
6           Those are the roles that Mr. Martinez
7   played in this grand conspiracy, as you can tell.
8   And Mr. Lehmann played it out as him being less
9   culpable than the other participants inside of this
10  conspiracy as a runner or an errand boy.
11          He also laid out kind of the history and a
12  little bit of context of the sentencing guidelines
13  and how they've changed over the years and how it's
14  been so really restrictive or conservative in use of
15  minimal participants.  It's taken out the language
16  that -- that would require the Court to use it
17  infrequently, and I think that was done back in
18  2019.  I think that's on page 12 of the objection.
19  And the Comment Section of the sentencing guidelines
20  took out the old language, "It is intended for the
21  downward adjustment for a minimal participant will
22  be used infrequently."
23          So what he was saying in this case, based
24  upon his actions and his role involved in this
25  conspiracy, he should be considered a minimal

```
 1   participant and get some points off his sentence

 2   based upon his actions and apply it -- it applies to

 3   him, and it should be more liberally applied than it

 4   used to be so restrictively applied in the past

 5   history.

 6            THE COURT:  Okay.  Mr. Leal.

 7            MR. LEAL:  Judge, I think there's just two

 8   objections I want to be sure to address.  First off,

 9   I want to go back to that objection in paragraph 20,

10   where the defendant was complaining to being held

11   accountable for 283.5 grams of methamphetamine.

12   That's actually the Keester transaction.

13            And in that, I would note that in calls

14   between the defendant and Mr. Cisneros, they're

15   actually talking about the amount of

16   methamphetamine.  Mr. Cisneros actually tells him

17   the amount came out to be "268," which is 268 grams.

18            THE COURT:  For that deal.

19            MR. LEAL:  Yes, Your Honor.

20            THE COURT:  All right.

21            MR. LEAL:  And then another call summary

22   reveals that Mr. Cisneros wonders what happened to

23   the original weight, because it was 336, and that's

24   in Government's Exhibit Number 3, which is attached

25   to the Government's Response to the Defendant's
```

1  Objections.

2          And the defendant tells Mr. Cisneros that

3  he had told him it was 12 ounces but that he would

4  take it.  And then the defendant tells him -- or

5  Mr. Cisneros tells him, "It's almost ten, just tell

6  him to pay for those," and that's what they agree

7  upon, to sell that for $3,900.  So I would argue

8  that that objection with regards to Keester in

9  paragraph 20 should be overruled.

10          As far as the mitigating role, this

11  defendant -- there's no question that this defendant

12  was less involved.  He was beneath Mr. Cisneros.

13  But as far as a mitigating role, the government

14  would argue that the evidence doesn't support that.

15  He scored as a zero, which is role-neutral.  And the

16  government would argue that that's actually pretty

17  conservative.

18          In the government's response and in

19  exhibits that have been submitted to the Court, the

20  government would note that in Government's Exhibit

21  Number 1, there's a statement on page 335 of that

22  exhibit, when Mr. Cisneros says that he wants the,

23  quote, shit, to be badass.  And again, case agents

24  determined that that was referring to

25  methamphetamine.

14

```
 1              The defendant said, "Yeah."

 2              And then when Mr. Cisneros complains about

 3     working by himself and needing the help of the

 4     defendant, the defendant tells Mr. Cisneros, "Nah, I

 5     got you, Dude.  That we need to get, we need to do

 6     that.  I got you."

 7              So clearly they're working together.  And

 8     while he may be a junior partner, he is working with

 9     him nonetheless.

10              Government's Exhibit Number 2 also reveals

11     they worked together.  Again, they are talking about

12     weight of the methamphetamine.  And then they

13     ultimately agreed to sell that methamphetamine.

14              Again, the government argues he's trusted

15     in this organization.  He's a cook in the

16     organization.  I think the exhibits that were

17     submitted to the Court reveal that, as well, Your

18     Honor.

19              So the government would argue that, based

20     upon the PSR and the reports and information that's

21     been submitted to the Court, the government would

22     argue that the defendant is conservatively scored

23     properly at a zero, which is role-neutral.

24              THE COURT:  All right.

25              Mr. Simmons.
```

```
 1              MR. SIMMONS:  Yes, Your Honor.
 2              THE COURT:  What else did you have?
 3              MR. SIMMONS:  The third objection, Your
 4    Honor.
 5              THE COURT:  No, no, to that objection.
 6              MR. SIMMONS:  Oh, to that objection.
 7         Your Honor, I think it applies to this
 8    case in terms of his -- if you look at the overall
 9    conspiracy and you look at his role in it,
10    especially page 5 of the objections that were filed
11    by Mr. Lehmann, those things there show a short
12    period of time between May and August and him
13    being -- they don't really address it, but him being
14    basically a goat, a donkey, a mule or an errand boy
15    for Cisneros and all his other cronies that he is
16    delivering to, and he is not that involved in this
17    conspiracy compared to the overall conspiracy.  And
18    at least -- at least this Court should consider
19    maybe making him a minimal or even a minor, maybe
20    two or three points in this case; probably not a
21    four, but maybe a two or three.
22              THE COURT:  Okay.  Thank you.
23         I think that the evidence is clear that he
24    is not a minor or minimal participant.  It's all set
25    forth in the presentence report, which I have
```

1   adopted and accepted.  And the government has

2   thoroughly refuted the allegation with facts, and we

3   have no facts from you that he was minimal or minor

4   participant.  So for that reason, I overrule the

5   objection.

6          What else did you have?

7          MR. SIMMONS:  Your Honor, Objection

8   Number 3 was a supplemental objection, and it is

9   basically an equitable argument on the application

10  of comparing methamphetamine versus -- actual versus

11  mixture, and I think you heard that in the last

12  sentencing.

13         THE COURT:  Yeah, go ahead, but I can't do

14  anything about it.  Go ahead.

15         MR. SIMMONS:  And that's why we are also

16  reserving the right in case --

17         THE COURT:  Yeah, absolutely.

18         MR. SIMMONS:  -- in case the Sentencing

19  Commission or 5th Circuit or somebody else makes

20  case law to change that.

21         THE COURT:  I hope they don't, because I

22  have been relying on them for so long for them to

23  tell me the right thing.  I would hate to be

24  mistaken and have to go back, but anyway.

25         MR. SIMMONS:  And it's a fair and

```
 1   equitable argument applied to all the defendants.
 2   And it really kind of depends on whether the
 3   government tests it or doesn't test it, whether --
 4   whether they admit to it or one part of a drug is
 5   being found actual methamphetamine and pure versus
 6   ghost dope that hasn't been tested.  And you've got
 7   this disparity that --
 8            THE COURT:  I agree with you.
 9            MR. SIMMONS:  -- defendants between -- in
10   not only one conspiracy, but when you apply the
11   sentencing guidelines overall broad spectrum to drug
12   cases, then you have a disparity in sentences based
13   upon who did what and whether they tested or not.
14            And on our end of it, we should be given
15   the benefit of the doubt.  And that's why I think
16   the guidelines are really trying to prevent that
17   from happening.  That's why they adopted them back
18   in 1985, was to get rid of the disparity between
19   defendants.  And we're asking to apply it as an
20   equitable argument in this case, Your Honor.
21            THE COURT:  Okay.  Overrule the objection.
22            Is that all the objections, Mr. Simmons?
23            MR. SIMMONS:  Yes, it is, Your Honor.
24            THE COURT:  Overrule all of the
25   objections.
```

18

```
1              I now adopt the Presentence Report,
2    Addendum Number 1, and Addendum Number 2 as the
3    findings and conclusions of the Court, with an
4    offense level 40, a criminal history category I, and
5    292 to 365 months.
6              Right, Mr. Leal?
7              MR. LEAL:  That's correct, Your Honor.
8              THE COURT:  Right, Mr. Simmons?
9              MR. SIMMONS:  I believe that's correct,
10   Your Honor.
11             THE COURT:  All right.  Mr. Simmons, go
12   ahead.
13             MR. SIMMONS:  Before we get started, Your
14   Honor, just a proffer real quick.  He has his family
15   here, and they are in the back.
16             THE COURT:  He has what?
17             MR. SIMMONS:  Family.
18             THE COURT:  All right.  Go ahead and stand
19   up, please.  All right.  All right.  Thank you very,
20   very much for coming.  I appreciate it, and it means
21   a lot to me that you are here.  Okay.  Thank you.
22             MR. SIMMONS:  He has his mother here, his
23   sister, his brother, and his longtime friend that
24   he's known since like the fifth grade, Your Honor.
25             THE COURT:  You know, he really messed up
```

19

```
1    when he left.
2             MR. SIMMONS:  Oh, I know that, Your Honor.
3             THE COURT:  That's the big thing here, but
4    go ahead.
5             MR. SIMMONS:  And the interesting thing is
6    you mention that, because his mom -- we talked to
7    his mother.  And the government was calling his
8    mother and saying, "Hey, listen we're looking for
9    your son."  And she did not like the fact that he
10   took off.  And she told the government where he was,
11   and they had to go get him in Mexico.  And I know
12   that's the biggest problem in this case, Your Honor.
13   She wanted him picked up and was trying to help in
14   doing so.  That just tells you the character of the
15   family.
16            THE COURT:  I mean, he has no prior
17   criminal record.
18            MR. SIMMONS:  He's got one point, Your
19   Honor.
20            THE COURT:  Yeah, it's ridiculous that he
21   left.  Where did he go, Mexico?
22            MR. SIMMONS:  A very small town in Mexico.
23   And he's going to give you that explanation when he
24   gives his statement.  But basically, Your Honor, he
25   heard large numbers after he cooperated, after he
```

```
 1    entered a plea.  Then he was hearing 20 years, and
 2    he basically freaked out.
 3            He was in his early 20s.  And the elevator
 4    usually doesn't go up all the way, because sometimes
 5    us 20-year-olds act like teenage boys, as I have a
 6    son.  And I still ask him today, "Hey, why did you
 7    do that?"  "I don't know."
 8            Sometimes the synapsis just don't quite
 9    connect and you make a bad decision, and then you're
10    too deep to make a decision to undo it.
11            THE COURT:  This was a really bad one.
12            MR. SIMMONS:  Absolutely, Your Honor.
13            THE COURT:  Go ahead.
14            MR. SIMMONS:  So he has a sister here
15    who -- he said something very touching to me.  He
16    said, "She's my best friend."  And I have a son and
17    a daughter, and I'm not sure I could say that about
18    my son and daughter, that they're best friends.
19            THE COURT:  How old are they?  How old are
20    your son and daughter?
21            MR. SIMMONS:  Oh, they are 24 and 25.
22            THE COURT:  Okay.  They'll get better.
23            MR. SIMMONS:  Yeah.  They're still night
24    and day.  It's just water in the mix.
25            These two, his sister and him, they are
```

1   really tight.  When he said, "She's my best friend,"
2   it was -- it meant a lot.  And when I talked to her
3   about it, she said, "Yeah, he's my best friend," and
4   she got a little teary-eyed.
5           He knows who is important in his life, and
6   they are here to support him.  And I talked to him
7   about it, too, and he mentioned it to me, "Hey,
8   where are my friends?"  He really don't have any,
9   other than his close family that is here when he got
10  involved in this thing.
11          His wife is in Mexico, that's where she
12  is.  They got married while he was down there.  He
13  has a child from another relationship here in the
14  United States who is 8 years old.  That's kind of
15  breaking his heart because of all this.
16          THE COURT:  Um-hum.
17          MR. SIMMONS:  And they would support that
18  and his character and what kind of man he is and
19  what kind of character Mr. Martinez is to his
20  friends and his family.
21          And then I would like to move right into,
22  I guess, an argument now, Your Honor.
23          THE COURT:  Go ahead, yes.  Yes.
24          MR. SIMMONS:  In this case, Your Honor,
25  we're trying to be creative here, because this is

22

```
 1   the problem.  You got a guy who enters his plea of
 2   guilty and then absconds from this Court and is gone
 3   for about five and a half years.
 4             THE COURT:  More.
 5             MR. SIMMONS:  Yeah, 66 months or so.
 6             We look at his previous presentence
 7   report.  The base offense level at that time would
 8   have been a level 36.  But because of the new
 9   guideline ranges with the drug calculations, I think
10   it's now a 34.  So it was 34 then and now.
11             He got two points for importation and two
12   points for a gun.  Then he got acceptance of
13   responsibility.  And then if you add in the
14   government's downward departure, minus one.  Now, he
15   might have gotten more.  If he had stayed around,
16   maybe he would have cooperated, maybe he could have
17   done more to help himself.
18             THE COURT:  Well, yes, if he helped
19   himself -- did he cooperate with the government at
20   all?
21             MR. LEAL:  Yes, Your Honor, the government
22   did file a --
23             THE COURT:  Oh, I got it, yeah.
24             MR. SIMMONS:  So at this point he gets one
25   point.  He may have gotten more later.  So that puts
```

1    him basically at a level 34 with a range of 151 to
2    188.  That's what it would have been before he took
3    off.
4            Now, with a level 34 and all those points
5    and then add in obstruction and then take away
6    acceptance of responsibility, he's at a level 39.
7            So what do we do with that?  I think, even
8    if you take the level as it is, that's enough
9    punishment, because he's getting a five-point swing,
10   three points for acceptance of responsibility, plus
11   two points for obstruction, which changes the
12   guideline range.  The goal of the prosecutor in this
13   case for him absconding and giving him only one
14   point really is to try to punish him, especially
15   when they're arguing for 300 months.
16           THE COURT:  And he's not even from Mexico.
17           MR. SIMMONS:  No, he's from here in the
18   United States.  Yes, Your Honor, you're right.
19           I think the creative way to do it is the
20   66 months, the five and a half years that he's been
21   gone, add it to his sentence of what he normally
22   would have gotten, and he would have been at a low
23   level of 151 or a high end of 188.  That range of
24   punishment would have been 217 to 254.
25           Now, what also this Court can do, too, is

1  compare the sentences of the other codefendants in

2  this case.  Now, I know the factors are different,

3  because he absconded versus somebody else who

4  didn't.  However, the lead guy in this case, who was

5  instructing him to do what he did, he's a lot less

6  culpable, as you heard from the government in our

7  argument for a mitigating role, and it makes sense

8  to not punish him more than the leader.

9           THE COURT:  What did the leader get?

10          MR. SIMMONS:  He got like 20 years, I

11  believe, Cisneros.

12          THE COURT:  Oh, he got -- Cisneros got a

13  life sentence.

14          MR. LEAL:  Oh, no, Judge.  He was

15  sentenced at 240 months.

16          THE COURT:  Oh, yes.  I'm sorry.  Yes, he

17  did.  Okay.

18          MR. SIMMONS:  And Mr. Martinez did what he

19  could at the time before he took off and cooperated.

20          And this kind of case doesn't call for

21  somebody to get a 300-month sentence based upon his

22  history and the factors of the sentencing

23  guidelines.

24          And the other thing, too, Your Honor, I

25  don't know how much government resources were

25

```
 1  expended to go and get the warrant, use
 2  international law, apply for the Mexican government
 3  to help them get Mr. Martinez here.  I know that
 4  took a lot of manpower, a lot of resources.  That's
 5  something the Court could order on restitution.  I
 6  don't know the number, but he's willing to pay that.
 7              THE COURT:  Okay.
 8              MR. SIMMONS:  The goal of sentencing is to
 9  create a sentence that's not greater than necessary
10  to achieve deterrence, rehabilitation or retribution
11  or punishment.  And in this case, I think that 217
12  months is more than enough to reach the goal of the
13  sentence.  The government was suggesting 300, with a
14  downward departure and a one point off.  I think it
15  would achieve the goals that this Court is seeking.
16  You've got this man's attention, and the family
17  would support that, too, Your Honor.
18              THE COURT:  Okay.  Mr. Martinez, stand up,
19  please.  Let's hear from you.
20              THE DEFENDANT:  Yes, ma'am.
21              THE COURT:  Go ahead.  What do you want to
22  say?
23              THE DEFENDANT:  Your Honor, just to shed
24  some light on --
25              THE COURT:  Be sure to speak into the
```

```
 1   microphone.  Okay.
 2           THE DEFENDANT:  Just to shed some light on
 3   what I did back in 2014, it wasn't more of the fact
 4   to mock the system, it was more of the fact that I
 5   felt like I had to run for my life, if you will.
 6           THE COURT:  I mean, you've got to stand up
 7   and face the music is what you should have done.
 8           THE DEFENDANT:  Oh, yes, ma'am.  And I'm
 9   here facing the music, and I accept my
10   responsibility and my wrongdoings.  I'm just
11   explaining why I did and what I did wasn't to mock
12   the system, it was more of the fact my previous
13   attorney had asked me to do certain things.  And one
14   of the things was to debrief with Mr. Leal and his
15   team, which I did so twice.
16           And throughout my house confinement on the
17   PR bond, two different occasions I received two
18   different messages from two different people, one of
19   them being a death threat.  The death threat, one
20   was about a month before I did what I did.  And a
21   week after that is when I -- I personally had to
22   call my lawyer to see where we were at on the
23   sentencing court date is when he broke the news to
24   me that things went haywire and I was looking at the
25   time that I was looking at.
```

27

```
 1                So, again, I felt like my walls were
 2      closing.  And it was more the heat of the moment I
 3      did what I did, which later I would tell myself it
 4      was more of a coward move.  Given the chance to do
 5      it again, I wouldn't.  And fast-forward me to now in
 6      Mexico.  As you know, Mexico is a harsh place.
 7                THE COURT:  Why did you go to Mexico?  Did
 8      you enjoy it there?
 9                THE DEFENDANT:  No, ma'am.  Again, it
10      was -- I couldn't run.  I couldn't do what I did and
11      stay in the United States, Your Honor.  And the
12      God-honest truth, my father has been there since
13      2004.  He was actually deported back in 2004 or
14      2005, and he's been there ever since.  So I ran to
15      him.  That's the truth.  I ran to him because I felt
16      like my walls were closing in.
17                And, again, being in that type of
18      environment, I had to push myself to become a much
19      stronger, much wiser, mature person, which I
20      personally believe that I achieved within the years
21      that I was there.  My work ethic grew.  I pushed
22      myself through obstacles that I didn't think I could
23      achieve.
24                And throughout the process, I met my wife.
25      She actually took me by the hand of marriage this
```

28

```
 1    past March.  And I've always painted her the
 2    picture -- perfect picture of what life would be
 3    like back in the States.  So, again, me, throughout
 4    the years becoming more wiser, more mature, I
 5    finally asked my sister to help me out in getting me
 6    an attorney to do the right thing and turn myself
 7    in.
 8            THE COURT:  Well, thank you to your
 9    family --
10            THE DEFENDANT:  Yes, ma'am.
11            THE COURT:  -- for encouraging you.
12            Is there anything else that you have to
13    say?  I was going to talk to Mr. Leal.
14            THE DEFENDANT:  I would hope that you give
15    me a second chance and to prove myself to you, to
16    the court, to my family, give me a second
17    opportunity, an opportunity that I won't fail at.
18    I've been without my daughter for -- I left her when
19    she was a year-and-a-half years old, and that's why
20    I used the word "coward," because that's what I
21    felt.
22            THE COURT:  It was.  It was.  Okay.
23            Let me hear from Mr. Leal.
24            Is there anything else you wanted to say?
25            THE DEFENDANT:  No, ma'am.
```

29

```
 1              THE COURT:  Mr. Leal?
 2              MR. LEAL:  Just very briefly, I would like
 3   to call Deputy U.S. Marshal Daryl Wieland.
 4              He's the Marshal that actually tracked the
 5   defendant down in Mexico.
 6              THE COURT:  Would you raise your right
 7   hand, please?
 8              (Witness sworn in.)
 9              THE WITNESS:  Yes, Your Honor.
10              THE COURT:  How about if you come over to
11   the lecturn -- oh, we have mics right there.  And
12   you can hold it up to you or sit down.
13              Good, good, good.  All right.  Go ahead.
14          DEPUTY U.S. MARSHAL DARYL WIELAND,
15   having been first duly sworn, testified as follows:
16                    DIRECT EXAMINATION
17   BY MR. LEAL:
18   Q.   And Deputy U.S. Marshal Wieland, would you
19   state your name for the record, please?
20   A.   Daryl Wieland.
21   Q.   And where do you work?
22   A.   I'm a Deputy United States Marshal, Northern
23   District of Texas, Fort Worth Division.
24   Q.   How long have you worked for the U.S. Marshal
25   Service?
```

30

```
 1   A.    17-and-a-half years.
 2   Q.    And in your work with the Marshal Service, have
 3   you had occasion to be assigned to a section in the
 4   Marshal Service where you track down fugitives?
 5   A.    Yes.
 6   Q.    And how long have you been assigned there?
 7   A.    It's -- really we just get assigned cases and
 8   just work them.
 9   Q.    Okay.  I want to turn your attention to a
10   person by the name of Salvador Martinez.
11         Are you familiar with a case that relates to
12   that particular person?
13   A.    Yes, I am.
14   Q.    And do you see that person seated in the
15   courtroom here today?
16   A.    Yes, sir, I do.
17   Q.    Can you tell the Court where he's sitting down
18   or standing?
19   A.    He's seated at the defense table next to his
20   defense attorney in a gray-and-black striped
21   jumpsuit.
22             MR. LEAL:  Your Honor, may the record
23   reflect that the witness has identified the
24   defendant?
25             THE COURT:  It will so reflect.
```

31

```
 1   Q.    (By Mr. Leal)   In regards to Salvador Martinez,
 2   also known as Saul, would you just very briefly tell
 3   the Court what efforts you went to to locate the
 4   defendant.
 5   A.    Well, I received the warrant back in 2014.  I
 6   started trying to locate through family members,
 7   through interviews, numerous interviews,
 8   surveillance, social media, and just throughout the
 9   years tried to locate the individual through social
10   media and interviews and follow-ups with certain
11   family members.
12   Q.    Now, when you talked to family members, what
13   was the response you got from family members?
14   A.    Initially, one of the first -- first two
15   interviews, not really cooperative.  I found some
16   not telling the truth.  Later throughout the
17   investigation, they started talking a little bit
18   more kind of about the whereabouts, but never really
19   proactive.  I would have to try to reach out to
20   them, and there were lengthy periods of time where
21   there was no communication.
22   Q.    All right.  At some point in time, did you
23   contact his mother?
24   A.    Yes.  She was actually one of the first
25   interviews that I had.
```

32

```
 1   Q.   Okay.  And did you tell her that she needed to
 2   tell him to turn himself in?
 3   A.   Yes.  I told her that it would be the safest
 4   way possible.
 5   Q.   Okay.  And did he ever turn himself in?
 6   A.   He did not.
 7   Q.   And did -- did family members specifically tell
 8   you where he was in Mexico?
 9   A.   They mentioned an area.  It was mentioned that
10   he was living with his father.  I didn't have all of
11   the identifiers or an exact location.  And then
12   there was also an address that was provided to me
13   that we had our Marshal Service in Mexico City and
14   Mexican officials go check out, and I was told that
15   that residence was abandoned, there was nobody at
16   that residence.
17   Q.   Okay.  At some point in time, did you send the
18   government photographs of the defendant?  And do you
19   have those with you here today?
20   A.   Yes, I did, and yes, I do have them.
21   Q.   Okay.  And those were actually submitted as an
22   exhibit in the Government's 5K motion.  They are
23   marked as Government's Exhibit Number 3.
24           MR. LEAL:   I tender that copy to defense
25   counsel, and then I can tender a hard copy to the
```

33

1    Court, Your Honor.  I think the Court has the

2    government's motion and the exhibits.

3              THE COURT:  If it's in the motion, I have

4    it.

5              MR. LEAL:  All right.

6    Q.   (By Mr. Leal)  And Deputy Marshal Wieland,

7    would you tell the Court what it is we're looking at

8    when we're looking at Government's Exhibit Number 3?

9         And if I first could get you to show the first

10   photograph to the Court.

11        Who is that?

12   A.   It's the defendant, Salvador Martinez.

13   Q.   And is that how he appeared when he was

14   extradited from Mexico to the United States?

15   A.   Yes, sir.  That should be exactly May 6th,

16   2020.

17             THE COURT:  Excuse me.  Sit six feet apart

18   from each other.  Go ahead.

19   A.   That should have been taken on the date of

20   May 6th, 2020, at the airport in Toluca, Mexico.

21   Q.   (By Mr. Leal)  Okay.  Page 2 of 5 of that

22   particular exhibit, would you tell the Court what it

23   is we are looking at there?

24   A.   Yes.  That is a picture that I took of the

25   defendant's wrist, just tattoos for record, and the

```
 1   restraints that were placed on his wrists and the
 2   belly chain.
 3   Q.   Okay.  And is that something that you used to
 4   help identify him?
 5   A.   Yes, it was.
 6   Q.   Okay.  Page 3 of 5 of that particular exhibit,
 7   would you tell the Court what it is we're looking at
 8   there?
 9   A.   This is social media of one of his family
10   members in which I was able to identify Salvador
11   Martinez.  I was also able to identify a family
12   member from here that it was his profile picture.
13   And it was when he went to go visit Salvador
14   Martinez and from the five years of --
15              THE COURT:  Went to go visit him where?
16              THE WITNESS:  In Mexico, Your Honor.
17              THE COURT:  All right.
18              THE WITNESS:  And I recognized the little
19   boy in the picture as being the half-brother -- I
20   believe it's the half-brother of Salvador Martinez,
21   Antonio Martinez, and --
22              THE COURT:  When was this picture taken?
23              THE WITNESS:  Your Honor, I believe this
24   picture was taken -- it's time-stamped from when
25   whoever posted it.  But I believe this one, if I
```

35

1    recall correctly, was September of last year.
2              THE COURT:  Before he was arrested?
3              THE WITNESS:  Yes, Your Honor.
4              THE COURT:  All right.
5    Q.   (By Mr. Leal)  And Government's Exhibit Number
6    3, page 4 of 5, would you tell the Court what it is
7    we are looking at in that particular photograph?
8    A.   This is a family reunion.  I'm not sure the
9    name of the actual family that was holding the
10   reunion.  But it has relatives.  And from left to
11   right it's Salvador, his father, stepmother,
12   brother, half-brother, and then his -- I think I
13   just wrote his father's name down underneath there.
14   Q.   And this photograph, was it taken in Mexico?
15   A.   Yes, it was.
16   Q.   During the last few years that he's been an
17   absconder?
18   A.   Yes, sir.
19   Q.   And then page 5 of 5 of Government's Exhibit
20   Number 3, that's another photograph.
21        Would you tell the Court what it is we're
22   looking at there?
23   A.   It looks like it's part of the same family
24   reunion and a reception or dinner or lunch that they
25   are having.

36

```
 1    Q.   Okay.  And there's writing on all these
 2    photographs.  Is that your handwriting?
 3    A.   Yes, it is.
 4    Q.   Okay.  In regards to these particular
 5    photographs, you said that you found one in 2019.
 6    That may not be the date that it was taken, but
 7    definitely you found one.
 8         So clearly, in your opinion, did his family
 9    know he was in Mexico, know where he was in Mexico
10    and probably could have brought him over if they
11    wanted to?
12    A.   Definitely from these picture I know at least
13    one family member knew exactly where he was.
14              MR. LEAL:  Pass the witness, Your Honor.
15              THE COURT:  Mr. Simmons.
16                      CROSS-EXAMINATION
17    BY MR. SIMMONS:
18    Q.   Who was the family member who knew exactly
19    where he was?
20    A.   That I believe knew exactly where he was?
21    Q.   Yes.
22    A.   His brother, Tony Martinez.
23              MR. SIMMONS:  Pass the witness.
24              MR. LEAL:  Nothing further, Your Honor.
25              THE COURT:  Thank you.  You are excused.
```

37

```
 1                 THE WITNESS:  Okay.
 2                 THE COURT:  Anything else from the
 3    defense?
 4                 MR. SIMMONS:  Nothing from the defense,
 5    Your Honor.
 6                 THE COURT:  Mr. Leal?
 7                 MR. LEAL:  Judge, in regards to this
 8    particular defendant, the government would argue
 9    that a sentence of 300 months is appropriate.  I
10    realize that that is more than Mr. Cisneros got.  He
11    was the leader of the organization.  He got 240
12    months.  But I think the distinction -- and
13    certainly Mr. Simmons is correct, if everything had
14    turned out the way it was supposed to turn out and
15    the defendant had taken care of his business the way
16    the other defendants in this case did that took care
17    of their business and showed up for court and showed
18    up and took their punishment and didn't run, then
19    things would have worked out.
20                 THE COURT:  Did he cooperate with you
21    before he left?
22                 MR. LEAL:  He cooperated before he left.
23    As a matter of fact, he cooperated before the plea
24    agreement was filed, which is why I promised in the
25    plea agreement supplement that I would file a one
```

```
 1    level 5K, at least based on his cooperation up to
 2    the date of his plea.  And so that's why I filed
 3    that.
 4              Subsequently -- I mean, he ran off, and so
 5    there's not too much to do after somebody runs off.
 6    And certainly there's not an opportunity for
 7    continued cooperation.
 8              It's interesting that the defendant states
 9    that one of the reasons that he took off was because
10    he got a death threat.  And I think he said he got a
11    death threat on his phone somewhere at the house or
12    a message related to a death threat.  And certainly
13    the Court is familiar with everything that goes on
14    in the drug world.  I know the Court is familiar
15    with the violence that's associated with the drug
16    world and particularly the violence that's
17    associated with the drug world in Mexico.
18              So after getting a death threat, I would
19    argue that the last thing somebody wants to do or
20    would want to do would be to go into the belly of
21    the beast, which is in Mexico where people are
22    getting killed in a drug war at a phenomenal rate,
23    astronomical rate.  That's where he went.  And
24    that's where he stayed for about five years until
25    the U.S. Marshals had to track him down.
```

39

1              Now, I had conversations with Mr. Simmons

2    and with Ms. Barbare right before the defendant got

3    arrested.  And Ms. Barbare told me that he wanted to

4    turn himself in.  And I think probably my response

5    to Ms. Barbare was, "Well, I will believe it when I

6    see it."  Of course he didn't turn himself in, the

7    Marshals caught him -- or not the Marshals, but the

8    Mexico law enforcement officials caught him with the

9    assistance of the United States Marshals.  And then

10   he was extradited to the United States from Mexico.

11             So while I understand 300 months is higher

12   than what Mr. Cisneros got, a sentence of 240

13   months, I will point out that the other defendants

14   that got lower sentences took care of business.  And

15   there ought to be some consequence for not taking

16   care of business and for leaving and for making

17   people hunt you down and look for you and making

18   them extradite you from Mexico.

19             THE COURT:  I agree.

20             MR. LEAL:  And so the government would

21   argue that a sentence of 300 months, based on

22   everything, is appropriate, Your Honor.

23             THE COURT:  Okay.  Thank you.

24             Would you please stand up, Mr. Simmons,

25   Mr. Martinez?

```
 1            Mr. Simmons, do you have anything else?

 2            MR. SIMMONS:  Yes, Your Honor, just for

 3   record purposes.  I think he would qualify for

 4   treatment and make that recommendation and to -- he

 5   mentioned del Reno.  I'm not familiar with that

 6   facility.  He says it's about two hours away.  We

 7   would ask that that be made as part of the

 8   recommendation.

 9            THE COURT:  You know, Mr. Martinez, I

10   would really like to help you.  It sounds like you

11   would like to at least verbally want to turn your

12   life around.  But it's hard to believe when you were

13   in Mexico -- that you left to Mexico and that you

14   stayed there for four or five years.  And it looks

15   like at least, in part, your family was down there

16   visiting while you were on the run.

17            So I can't feel sorry for you.  I don't

18   feel sorry for you.  I'm glad you turned your life

19   around.  At least you think you have, and I hope you

20   have, but it doesn't mitigate anything.  It doesn't

21   mitigate anything.  And by leaving, you put your

22   life in our hands, and I'm afraid that that has been

23   a bad result.

24            So for the safety of the community, for

25   the respect for the law, to promote respect for the
```

1    law, to provide just punishment, and for all the

2    other reasons of 3553 factors, I'm going to sentence

3    you to 300 months in custody.

4              It is five years supervised release, no

5    fine, no restitution, a 100-dollar mandatory special

6    assessment.

7              Pursuant to the Sentencing Reform Act of

8    1984, the defendant is committed to the custody of

9    the Federal Bureau of Prisons for a period of 300

10   months.

11             The defendant must be allowed to

12   participate in drug abuse -- substance abuse

13   treatment programs within the Federal Bureau of

14   Prisons if he's eligible.

15             It is ordered upon release from

16   imprisonment the defendant shall be placed on

17   supervised release for a period of five years.

18             It is further ordered that upon release

19   from imprisonment, the defendant shall comply with

20   the standard conditions contained in this judgment

21   and the mandatory conditions stated herein:

22             The defendant cannot commit another crime,

23   federal, state, or local.

24             He must not unlawfully possess a

25   controlled substance.

```
 1            He must cooperate in the collection of DNA
 2   as directed by probation.
 3            He must refrain from any unlawful use of a
 4   controlled substance.
 5            The defendant must submit to one drug test
 6   within 15 days of release from imprisonment and at
 7   least two periodic drug tests thereafter as directed
 8   by the Court.
 9            The defendant shall participate in a
10   program approved by probation for treatment of
11   narcotic drug or alcohol dependency, which would
12   include testing for the detection of substance use
13   or abuse.
14            The defendant shall abstain from the use
15   of alcohol and/or all other intoxicants during and
16   after completion of treatment and contribute to the
17   costs of services rendered at $10 per month.
18            The defendant shall provide probation any
19   requested financial information.
20            You can appeal this sentence,
21   Mr. Martinez, and you have two weeks from the date
22   of my judgment -- which will probably be tomorrow --
23   to file a notice of appeal.  Please ask Mr. Simmons
24   to file an appeal for you if you want to.
25            Mr. Simmons, would you find out from him
```

```
 1   if he wants to appeal and timely file the notice?
 2             MR. SIMMONS:  He has indicated to me that
 3   he does want to appeal, Your Honor, and I believe he
 4   would probably qualify for a court-appointed
 5   attorney.
 6             THE COURT:  Okay.  If you will tell us you
 7   want to withdraw, we will look into that.  He's got
 8   to sign an IFP form and all that stuff.
 9             MR. SIMMONS:  Do I need to file a motion
10   or make that orally today?
11             THE COURT:  Yeah, file a motion.
12             MR. SIMMONS:  Okay.
13             THE COURT:  And anything else from the
14   defense?  What else did you ask for?
15             MR. SIMMONS:  For record purposes, I want
16   to object to the reasonableness of the sentence for
17   appellate purposes.
18             THE COURT:  I'm incorporating by reference
19   the provisions of AO 245B, 918 and -- or the edition
20   of U.S. Guideline Section 5D1.3(c).
21             Okay.  Mr. Leal?
22             MR. LEAL:  Your Honor, the government
23   moves to dismiss the remaining counts as to this
24   particular defendant.
25             THE COURT:  As to this particular
```

```
 1    defendant only, the remaining counts are ordered

 2    dismissed.

 3              And I will try El Reno if it's there.

 4    Okay?

 5              All right.  We are going to remand the

 6    defendant to federal custody and be in recess for

 7    about five minutes.

 8              (Court in recess at 2:32 p.m.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    C E R T I F I C A T E
 2            I, Shawnie Archuleta, CCR/CRR, certify
 3    that the foregoing is a transcript from the record
 4    of the proceedings in the foregoing entitled matter.
 5            I further certify that the transcript fees
 6    format comply with those prescribed by the Court and
 7    the Judicial Conference of the United States.
 8            This 12th day of November 2020.
 9
10
11                         s/Shawnie Archuleta
                           Shawnie Archuleta CCR No. 7533
12                         Official Court Reporter
                           The Northern District of Texas
13                         Dallas Division
14
15
16    My CSR license expires:  December 31, 2020
17    Business address:  1100 Commerce Street
                         Dallas, TX  75242
18    Telephone Number:  214.753.2747
19
20
21
22
23
24
25
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**